# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **GORDON W. ADAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:02-0469** |
| **v.** | ) | **Judge Nixon / Knowles** |
| | ) | |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on cross-Motions for Judgment on the Administrative Record. Docket Entry Nos. 11 and 13.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED and Defendant's Motion for Judgment on the Administrative Record be GRANTED.

## I.  INTRODUCTION

Plaintiff filed his applications for DIB and SSI on December 5, 1996, alleging that he had been disabled since January 31, 1996, due to problems with his back, knees, eyes, and diabetes.

1

Docket Entry No. 7, Attachment ("TR"), 93; 145-148; 328-330. Plaintiff's applications were denied both initially (TR 92-93; 331) and upon reconsideration (TR 94-95; 338). Plaintiff subsequently requested (TR 119) and received (TR 56-91) a hearing. Plaintiff's hearing was conducted on April 2, 1998, by Administrative Law Judge ("ALJ") John P. Garner. TR 56-91. Plaintiff and vocational expert ("VE"), Gina Thomas, appeared and testified. TR 56. Also present was Plaintiff's attorney. TR 58.

On August 7, 1998, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 96-105. Specifically, the ALJ made the following findings of fact:

1. The claimant has alleged that he became unable to work on January 31, 1996. The claimant first met the disability insured status requirements of the Act on July 1, 1996, and continued to meet them through September 30, 1996; disability must be established on or prior to this date to be eligible for Title II benefits. Eligibility for Title XVI benefits continues through the date of this decision.

2. The claimant has not engaged in substantial activity since January 31, 1996.

3. The medical evidence establishes that the claimant has "severe" residual of back disorder and noninsulin-dependent diabetes, but that he does not have an impairment or combination of impairments listed in, or medically equivalent to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's testimony is not found credible to the extent alleged for the reasons given above.

5. The claimant's residual functional capacity for the full range of medium work is reduced by limited squatting, no work around heights and limited climbing. (20 CFR 404.1545 and 416.945).

2

6.    The claimant is unable to perform his past relevant work as a small appliance repairman, an appliance technician and a welder.

7.    The claimant was 56 years old on the alleged onset date, which is defined as advanced age (20 CFR 404.1563 and 416.963).

8.    The claimant has a tenth grade or limited education (20 CFR 404.1564 and 416.964.

9.    The claimant does not have any acquired work skills which are transferable to the skilled or semiskilled work activities of other work (20 CFR 404.1568 and 416.968).

10.    Although the claimant's limitations do not allow him to perform the full range of medium work, using rule 203.04 as a framework for decisionmaking, there are a significant number of jobs in the national economy which he could perform.  Examples and numbers of such jobs identified be the vocational expert are listed above.

11.    The claimant was not under a disability as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520 (f) and 416.920 (f)).

TR 104-05.

On August 26, 1998, Plaintiff timely filed a request for review of the hearing decision. TR 131.  On May 3, 2000, the Appeals Council issued a letter remanding the case to the ALJ to review the case.  TR 137-139.  Plaintiff's second hearing was conducted on September 14, 2000, by ALJ Robert C. Haynes.  TR 25-55.  Plaintiff and VE, Lisa A. Courtney, appeared and testified.  Also present was Plaintiff's attorney, Phillip A. George. TR 27.

On October 31, 2001, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 13-22.  Specifically, the ALJ made the following findings of fact:

3

1.  The claimant met the insured status requirement of the Act as of the alleged onset date.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset date.

3.  The claimant has "severe" impairments, including diabetes mellitus and degenerative disc disease of the lumbar spine, with low back disorder and lower extremity disorder.

4.  The claimant's impairments, considered individually and in combination, do not meet or equal in severity any impairment set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  The claimant's allegations of pain and functional limitations are not credible.

6.  During the period in question, the claimant retained the residual functional capacity to occasionally lift and/or carry less than 50 pounds, less than 25 pounds frequently, with walking and/or standing limited to less than six hours and sitting to six hours of an eight-hour workday, with limited climbing and limited exposure to unprotected heights, with limited bending and twisting, and allowing the option to sit or stand at will.

7.  The claimant cannot perform any past relevant work.

8.  The claimant is of advanced age.

9.  The claimant has a limited education.

10. The claimant has not acquired skills that will transfer to other jobs within the residual functional capacity set out above.

11. The framework of Rule 203.12 of the Medical-Vocational Guidelines and vocational expert testimony demonstrate that the claimant has the residual functional capacity to perform jobs that exist in significant numbers in the national economy.

12. The claimant was not disabled within the meaning of the

4

Act during the period in question.

TR 21-22.

On December 12, 2001, Plaintiff timely filed a request for review of the hearing decision. TR 10-12. On March 6, 2002, the Appeals Council issued a letter declining to review the case (TR 8-9), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff alleges disability due to problems with his back, knee, and eyes, as well as diabetes. TR 93.

Plaintiff was examined by Dr. John Collis on January 23, 1990. TR 250-251; 248. Plaintiff's chief complaint was pain in his lower back. TR 250. Plaintiff also complained of pain in his left leg. *Id.* Dr. Collis performed a neurological examination of Plaintiff, and most of the neurological tests were "normal." *Id.* Dr. Collis noted that, "[p]in sensation is decreased over the left lateral calf and foot." TR 251. Plaintiff's lumbar range of motion was "90 degrees forward flexion." *Id.* Dr. Collis' diagnosis was "[b]ilateral spondylolysis of L5, aggravated by an injury in December 1985." *Id.*

Dr. Collis wrote a letter to Plaintiff on January 24, 1990, in which he reported that Plaintiff had a "well performed" MRI study, but that another study was needed. TR 248. Dr. Collis reported that he advised outpatient care at Lutheran Medical Center for "medications,

5

laboratory testing, discogram (lumbar), paraspinal block, physical therapy and traction (lumbar)." *Id.*

Plaintiff reported to Lutheran Medical Center on May 22 and 23, 1990, for a general physical examination. TR 243. That examination was performed by Dr. Collis and "Dr. Y. Kim," and was "essentially normal." *Id.* Plaintiff complained of low back pain and left leg pain. *Id.* On May 22, Plaintiff underwent a "lumbar discogram," and on May 23, Plaintiff underwent a "lumbar paraspinal block." *Id.* Dr. Collis' diagnoses were "spondylolisthesis L5" and "degenerated L5 disc." *Id.*

Dr. Collis wrote a letter to Plaintiff on July 12, 1990, noting that he had examined Plaintiff that day and that he had diagnosed Plaintiff with "[d]egenerated L5 disc, L5 spondylolisthesis." TR 247. Dr. Collis advised "lumbar laminectomy with L5 total disc replacement" to Plaintiff at this appointment, and outlined the risks and advantages of this procedure. *Id.*

Records were also obtained from Lutheran Medical Center dated September 5, 1990, but these records are largely illegible. TR 300-302.

Dr. Collis examined Plaintiff on September 11, 1990. TR 304-305. Plaintiff complained of "worse pain" in his back and pain in his left leg. TR 304. Plaintiff also reported "occasional paresthesis with pain." *Id.* Dr. Collis performed a neurological examination of Plaintiff, and most of the tests were "normal." *Id.* Dr. Collis noted that, "[p]in sensation is decreased over the left lateral calf and foot." TR 305. Plaintiff's lumbar range of motion was "90 degrees forward flexion." *Id.* Dr. Collis' diagnosis was "[d]egenerated L5 disc, L5 spondylolisthesis." *Id.*

Plaintiff was admitted to Lutheran Medical Center on September 12, 1990. TR 244.

Plaintiff's general physical examination was "essentially normal" and a neurological exam disclosed back pain and left leg pain. *Id.* Plaintiff underwent a "lumbar laminectomy with L5 total disc replacement." *Id.* Dr. Collis' preoperative/postoperative diagnosis was "L5 spondylolisthesis, bilateral spondylolysis, and degenerated L5 disk [*sic*]." TR 310. Plaintiff's "home going restrictions" were "[b]race for four months, no driving for two months, no strenuous exertion." TR 244 (capitalization omitted). Plaintiff was prescribed Codeine, Darvon, and Ativan. *Id.* A report dated September 16, 1990, indicated that Plaintiff's lumbar spine showed "minimal forward slipping." TR 313. The doctor's conclusion[1] was that Plaintiff demonstrated "[s]tatus post lumbosacral [*sic*] laminectomy and interbody fusion" and "[g]rade 1 spondylolisthesis L5-S1." *Id.* Plaintiff's condition at his discharge on September 17, 1990 was stable. TR 244.

Dr. Indira Pillay examined a "[b]one and soft tissue" specimen from Plaintiff's "'A' Disc" and, on September 18, 1990, reported that Plaintiff's specimen showed "multiple fragments of degenerated cartilage" and "fragments of fibroelastic tissue and degenerated cartilage." TR 315.

Dr. Collis wrote a letter to Plaintiff on November 19, 1990, stating that he had examined Plaintiff on November 15, 1990. TR 246. Dr. Collis reported that Plaintiff's progress since surgery was "quite satisfactory" and that Plaintiff's incision had healed well. *Id.* Dr. Collis further reported that Plaintiff's disc replacement was "in good alignment" and that Plaintiff's "healing is progressing well." *Id.* Dr. Collis told Plaintiff that he "may plan to get back to your regular work on 4-1-91." *Id.*

---

[1]The name of the doctor who completed this form is illegible.

Dr. Collis wrote a letter to Plaintiff on March 20, 1991, stating that he had examined Plaintiff on March 14, 1991 and that he was "pleased to find that you are having less pain than before surgery." TR 245. Dr. Collis reported that Plaintiff's neurological examination was "stable," that Plaintiff's x-rays showed "excellent progress," and that he recommended simple stretching exercises to Plaintiff. *Id.* In particular, Dr. Collis noted that "[a]n exercycle would be ideal." *Id.*

Dr. Mark T. Finneran examined Plaintiff on March 4, 1994. TR 252. Plaintiff's chief complaint was a "[h]istorical injury to the lumbar spine." *Id.* Dr. Finneran reported that Plaintiff had seen two doctors, Dr. Swetland and Dr. Kim Knight, prior to seeing Dr. Collis,[2] and that Plaintiff continued to see Dr. Knight monthly. *Id.* Dr. Finneran reported that Plaintiff's surgical scar was "well healed," that Plaintiff's comfortable range of motion was "reduced in all directions," that Plaintiff's flexion was 45 degrees, that Plaintiff's extension was 20 degrees, that sensation was "diminished" in the left L-5 distribution," and that Plaintiff's straight leg raise "produces no evidence of radiculopathy." *Id.* Dr. Finneran's diagnosis was "[s]train lower back; degenerative disc disease at L-5." *Id.* Dr. Finneran stated that Plaintiff presently had a "twenty-four percent" whole body permanent partial impairment. *Id.*

A Record of Operation/Procedure, dated June 7, 1996, indicates that Plaintiff underwent irrigation and debridement of his right knee in March of 1996 by Dr. McDonald, had been on oral antibiotics since then, and had returned for a possible knee infection. TR 255; 257; 416-17. On June 7, 1996, Dr. Nabil Ebraheim performed an irrigation and debridement of Plaintiff's right knee prepatellar bursa and tissue under local anesthesia. TR 256-257. Plaintiff tolerated the

---

[2]Dr. Finneran's report mistakenly refers to Dr. Collis as "Dr. Collous."

procedure well and was stable on the way to the recovery room.  TR 257.  On June 11, 1996,

Plaintiff returned to the operating room for another "irrigation and debridement" and wound

closure of his open wound on the right knee.  TR 256.  Once again, Plaintiff tolerated the

procedure very well, there were no complications, and he was stable on the way to the recovery

room.  *Id.*

A record dated June 26, 1996, reported that Plaintiff was doing "much better" and that he

had "no swelling" and "no tenderness."  TR 270.

On July 3, 1996, Plaintiff returned to Dr. Ebraheim for a one week follow-up visit.  TR

266.  Plaintiff reported that his wounds were getting better and that his daughter, who was a

nurse, was doing his dressing changes for him.  *Id.*  Dr. Ebraheim confirmed that Plaintiff's

wounds looked excellent, that the wires closing the wound were still intact, and that there was no

drainage.  *Id.*  Plaintiff had half of his wire stitches removed and was told return in two weeks to

have the other half removed and to stay on antibiotics.  *Id.*

On July 18, 1996, Plaintiff was seen by Dr. G. Georgiadis for a checkup of his knee

infection.  TR 265.  Dr. Georgiadis reported that Plaintiff was status post 4-5 weeks for irrigation

and debridement for right perpatellar bursitis, was doing well, and was without complaint.  *Id.*

On December 18, 1996, Dr. Kim E. Knight submitted a letter to Ronald Shaw, in the

State of Tennessee Department of Human Services Disability Determination Section.  TR 275.[3]

The letter enumerated Plaintiff's medical problems as follows:

> 1) He has chronic low back pain with Degenerative Disc Disease.
> He has had surgery in the past.  He is left with constant pain in the
> lower back with associated back spasms.  He also has weakness in

---

[3]This letter is duplicated at TR 418.

9

the left foot and ankle.

2) He has a history of Hypercholesterolemia with a family history of heart disease.

3) He has Non-insulin Dependent Diabetes Mellitus.

4) He had Septic Pre-patellar Bursitis that required removal of the Pre-patellar Bursa. He still has pain and chronic effusion in that knee.

TR 275. Dr. Knight further reported that the Plaintiff was taking the following medications: Micronase, Lioresal, Amitriptyline, and "NSAID's" for pain. *Id.* Dr. Knight also added that Plaintiff "should be considered totally and permanently disabled." *Id.*

Dr. Knight wrote another (undated) letter to attorney William R. Polhamus. TR 276. Dr. Knight noted that the Workmen's Compensation doctor, Dr. Sethi, had indicated that Plaintiff no longer needed medicine, therapy or doctor's visits but that on physical exam, Plaintiff had constant and recurring pain involving the lower back. *Id.* According to Dr. Knight, the pain limited Plaintiff's ability to work and live a normal life and that, at times, the pain was so bad that Plaintiff was not able to walk and could feel the swelling in his lower back. *Id.* Plaintiff's pain reportedly radiated down his left leg and he still had tingling and numbness involving the left leg. *Id.* Dr. Knight noted that, on examination, Plaintiff showed tenderness and spasms in the lower lumbar sacral region, had absent reflexes in the lower extremities, and had marked weakness in the left leg. *Id.* The letter also explained that Plaintiff's treatment was aimed at trying to keep the pain under control so that he could try to lead a normal life; that he was presently on Ultram, Norflex, and Amitriptyline; and that Plaintiff did stretching exercises at least two to three times a day. *Id.* Dr. Knight concluded by saying that Plaintiff's symptoms were a direct cause of his work related injuries, that the problem would continue to haunt him,

10

and that his medical treatment should therefore be paid for be the Bureau of Workmen's Compensation. *Id.*

Dr. Bruce Davis performed an "All Systems Exam" of Plaintiff on January 15, 1997. TR 279-281. Dr. Davis noted that the Plaintiff had a chronic overweight condition, was currently at his highest weight, had weighed over 200 pounds for ten to fifteen years and weighed over 150 pounds for thirty years, and was not then on any weight loss program. TR 279. Dr. Davis also reported that Plaintiff had a two year history of elevated blood sugar treated with diet, oral medication, home blood sugar monitoring, and physician visits without coma or target damage. *Id.* Dr. Davis also reported that the Plaintiff had injured his back at work in 1985 and complained of lower left back pain, swelling aggravated by activity and position, and left leg shooting pain. *Id.* In addition, Dr. Davis noted that Plaintiff had contracted a right knee infection after injury, had undergone surgery, and had pain, swelling and unsteadiness. *Id.* The notes indicate that Plaintiff's treatment included rub, ice, elastic support, home stretching exercises, medication, occasional use of a cane, and physician visits. *Id.* Dr. Davis noted that Plaintiff had a full range of motion in his back, that Plaintiff had reduced leg sensation, that Plaintiff's straight leg raise was limited to 45 degrees, that Plaintiff's hip flexion was 90 degrees, and that Plaintiff had "full motion" in his right knee. TR 280.

Dr. Davis' diagnoses were "Grade 2 Obesity," "Non-insulin-dependent diabetes mellitus," "Musculoskeletal disease: back injury/surgery, knee injury/surgery," "Bilateral cataract surgery," and "Hypertension." TR 281. Dr. Davis opined that Plaintiff's clinical conditions were "chronic" and unlikely to improve with active treatment. *Id.* Dr. Davis also opined that Plaintiff could occasionally lift and/or carry up to 50 pounds, frequently lift and/or

11

carry up to 25 pounds, stand and/or walk for less than six hours in an eight-hour workday, and sit for eight hours in an eight-hour workday. *Id.* Dr. Davis stated that Plaintiff's limitations were "limited squatting" and "limited climbing/heights." *Id.*

Dr. Louise Patikas completed a Residual Functional Capacity assessment of Plaintiff on January 27, 1997. TR 282-289. Dr. Patikas opined that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push and pull without limitation. TR 283. Dr. Patikas further opined that Plaintiff could "frequently" climb, balance, stoop, kneel, crouch, and crawl. TR 284. No manipulative, visual, communicative, or environmental limitations were noted. TR 285-286.

Medical Records indicate that Plaintiff was examined by Dr. Wendy R. Tennyson on August 22, 1997; January 7, 1998; and February 9, 1998, and confirm that Plaintiff was diabetic and had experienced bone fracture. TR 290-99.[4]

On January 8, 1999, Plaintiff was admitted to the Middle Tennessee Medical Center Emergency Department after being involved in a two car motor vehicle accident the previous afternoon. TR 431-436. Plaintiff had been driving with his seatbelt on when he was hit from behind and he had been suffering from low back pain since that time. TR 431. The Emergency Department's report indicated that Plaintiff had no C-spine or thoracic tenderness and no CVA tenderness, though a straight leg raise elicited pain. *Id.* An LS-spine x-ray showed no acute fractures or dislocations. TR 431-432. The diagnosis was acute low back pain and strain

---

[4] These Medical Records consist of handwritten Progress Notes and diagnostic evaluations that are largely illegible.

12

secondary to a motor vehicle accident.  TR 431.  Plaintiff was given a prescription of Lortab 5 for pain control, had been advised to follow up with his doctor in seven to ten days if he was not improving, and was told to return to the Emergency Room if his condition deteriorated.  *Id.*

On February 12, 1999, Plaintiff was examined by Dr. George H. Lien.  TR 420-423. Dr. Lien reported that Plaintiff was status post lumbar fusion, that Plaintiff had continued lower back pain and left leg radiating pain and that Plaintiff's pain had been worse since a motor vehicle accident in January 1999. TR 423.  Plaintiff reportedly described primarily lower back pain, with left hip and entire left leg radiating pain, and weakness and numbness in the left leg.  *Id.* Dr. Lien also reported that Plaintiff was taking Norflex for his pain.  He also noted that Plaintiff's medical history was remarkable for a history of diabetes mellitus.  *Id.*

Upon examination of Plaintiff, Dr. Lien noted that he appeared to be in mild distress.  TR 423.  Dr. Lien also observed that Plaintiff's back was without point tenderness but that there was positive left sciatic notch region tenderness.  *Id.*  Dr. Lien also reported that Plaintiff had pain with straight leg raising on the left at 45 degrees, that his motor strength was 3-4/5 in left dorsiflexion and the remainder of his motor strength was 5/5 throughout the lower extremities. *Id.*  Dr. Lien also reported that Plaintiff's sensations were decreased to pinprick in the left S1 sensory Dermatome and that his deep tendon reflexes were 2+ and symmetric at the knees and ankles, with downgoing toes bilaterally.  *Id.*

Dr. Lien further noted that Plaintiff had x-rays taken of his lumbar spine and it appeared as though he had fusion at the L5-S1 level, probably secondary to an interbody fusion.  TR 423. Plaintiff reportedly had a mechanical type of lower back pain, but with a significant component of left lumbar radiculopathy; was status post lumbar fusion; and had significant left dorsiflexion

13

weakness.  *Id.*  Dr. Lien stated that, in his opinion, Plaintiff's pain represented an exacerbation of a long-standing problem by the motor vehicle accident in January of 1999.  *Id.*  Dr. Lien believed further evaluation was necessary in light of Plaintiff's significant pain and scheduled him for a lumbar MRI scan.  *Id.*

Dr. Ramsey O. Walker performed an "all systems examination" of Plaintiff on August 11, 1999.  TR 437-440.  Dr. Walker noted that Plaintiff's allegations were "[b]ack pain," "[d]amage disk [*sic*]," and "[d]iabetes."  TR 437.  Plaintiff reported that his back surgery helped for "about six months," but that after that point he began to experience "severe" back pain.  *Id.*  Plaintiff reported that he was put on "light duty" on his job and was subsequently fired.  *Id.*  Plaintiff reported continued pain in his lower back, which he compared to "sitting on a baseball." *Id.*

Dr. Walker noted that Plaintiff carried a cane, which he used for "ambulation safety." TR 439.  Dr. Walker further noted that Plaintiff had a normal range of motion in his upper extremities, and that his grip was "graded at 4/5 bilaterally."  *Id.*  Plaintiff also had a normal range of motion in his hips, left knee, both ankles, and both feet.  *Id.*  Dr. Walker noted that Plaintiff's range of motion was also normal in his right knee.  *Id.*  Dr. Walker further noted that Plaintiff's back revealed "significant tenderness" in the lumbar spine.  TR 440.  Dr. Walker reported that Plaintiff's range of motion and flexion in his back were both "significantly limited."  *Id.*  Dr. Walker reported that "right and left flexion" of Plaintiff's back was 20 degrees, that extension of Plaintiff's back was five degrees, that Plaintiff's left straight leg raise was "done to 40 [degrees]," and that Plaintiff's right straight leg raise was "to 45 [degrees]."  *Id.*

Dr. Walker's impressions were "[l]umbar disk disease," "[d]iabetes mellitus," and

14

"[m]oderate high blood pressure value at this time."  TR 440.

Dr. Lawrence G. Schull completed a Residual Functional Capacity assessment of Plaintiff on August 20, 1999.  TR 441-448.  Dr. Schull opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, sit for about six hours in an eight-hour workday, and could push and pull without limitation.[5]  TR 442.  Dr. Schull further opined that Plaintiff could never climb, but that he could occasionally balance, stoop, kneel, crouch, and crawl.  TR 443.  No manipulative, visual, communicative, or environmental limitations were noted.  TR 444-445.

### B. Testimony from Plaintiff's April 2, 1998 Hearing

### 1.  Plaintiff's Testimony

Plaintiff was born on September 6, 1940, and stayed in school until partway through the eleventh grade.  TR 61.

Plaintiff testified that, in 1989, after he had sustained his work injury, he had attended a formal vocational six-month training course at a private school in Ohio, which taught him how to work on electronic household appliances.  TR 62.  Plaintiff reported that upon completing the course, he received a diploma which showed he had finished his basic electronic training.  *Id.*  Plaintiff stated that after his alleged disability onset date of January 31, 1996, he was briefly self-employed for three weeks in April of 1996 and on and off sporadically from July to September of that year.  *Id.*  Plaintiff reported that at this time he worked on household appliances such as refrigerators, stoves, washers and dryers, which was what he had been doing prior to 1996 for

---

[5]With regard to Plaintiff's ability to stand and/or walk, Dr. Schull placed his checkmark halfway between the "at least 2 hours" and "about 6 hours" boxes.

15

roughly a three year period.  TR 63.  Plaintiff also stated that this had been full time work but gradually tapered off as his condition worsened and he could no longer move the heavy appliances until he stopped working entirely.  *Id.*  Plaintiff explained that prior to his work as a self employed repair person he had worked as an appliance technician which involved the same type of activities as with his self-employment.  TR 63-64.  In terms of the duties and physical demands of the work involved, Plaintiff reported that he took "trade-ins" to rejuvenate them for resale which entailed moving refrigerators and washers and dryers, generally on his own, and positioning them so that he could perform work on them.  TR 64.  Plaintiff stated that a refrigerator weighed in excess of 100 pounds.  TR 64-65.  Plaintiff reported that sometimes people brought an appliance to him and sometimes he would have to fetch them from people's homes.  TR 65.  Plaintiff added that the work he performed was performed in both the seated and standing position but involved primarily standing and required much bending and stooping.  *Id.*

Plaintiff testified that, prior to his work as an appliance technician, he worked as a welder which required sitting, standing and walking, depending on the work on the placement of the joints he was welding.  TR 66.  According to Plaintiff, this work required tremendous amounts of lifting, such as moving beams and cables and dragging 100 pounds of welding cables across the floor.  TR 67.  Plaintiff reported that his back hurt when doing this work, that he had to take medicine, and that the medicine was impairing his decisions to such a point that he was afraid to drive and his ability to perform repair jobs was affected.  *Id.*  For instance, Plaintiff reported the medicine could make him forget the task he was performing while he was working on it, which required him to start over from the beginning.  *Id.*  Plaintiff further stated that the medicine "kind of numbed you" and that he could be holding a conversation with someone and forget what he

was discussing in the middle of it, or forget to put a new cord on something he was repairing so that when he plugged it in it would short and he would have to start from the beginning again. TR 68. Plaintiff stated that he was called back to redo some of his jobs and that this was a nuisance and a hazard for his customers. *Id.*

 Plaintiff stated that he moved to Tennessee in either September or October of 1996 and had not engaged in any appliance repair business since that time. TR 69. Plaintiff reported that his problem started in Ohio where he was treated by Dr. Kim Knight. *Id.* Plaintiff testified that he had identified the medication prescribed by Dr. Knight that was causing him problems. TR 70. Plaintiff did not remember certain of the medications' names but noted that Norflex was part of the problem. *Id.* Plaintiff also stated that when the doctor tried to switch the medications, his back pain returned. *Id.*

At this point in the testimony, Plaintiff's attorney started questioning Plaintiff and asked him whether he had had a sex change operation, to which Plaintiff responded "[n]o. I like to be a man." TR 70. Plaintiff's attorney explained that he needed to clarify a medical document which referred to Plaintiff as "she" and which reported that he had a normal breast exam. *Id.*

Plaintiff next reported that his back was the primary reason that led him to quit working. TR 71. He stated that he was in pain all the time and had pain in his lower back and left leg and that, according to Dr. Knight, the pain in his leg was related to his back pain. *Id.* Plaintiff rated the severity of the pain at about five on a scale of one to ten, ten being excruciating pain, and stated that, if he attempted to pick anything up, the pain would easily reach a nine or a ten. TR 72. Plaintiff added that, besides lifting, his pain generally became more severe when walking or sitting in a chair where he had pressure on his tailbone. *Id.* He reported that he had to keep

17

pressure off his back and had to wear suspenders rather than a belt or he would get severe leg pain.  *Id.*  Plaintiff stated that the pain in his left leg interfered with his ability to walk, noting that it would "get a real needly feeling" and then would go numb, that it would get weak and sometimes shake and that he could not be sure whether it would support him.  *Id.*

Plaintiff also testified that he had a problem with his right knee, that he had been hospitalized as a result in January of 1996, but that this treatment did not alleviate the problem. TR 73.  Plaintiff stated that the problem was basically an infection under his knee cap, that the operation was an effort to drain the infection, and that, after two operations, it was still about one and a half times the size of his left knee.  *Id.*  Plaintiff reported that his knee was painful and felt as if he had sand under his kneecap because it would rub and grind as he walked.  *Id.*  Plaintiff added that this condition affected his ability to stand and walk because when his right knee was swollen he did not know on which leg he should limp because his left leg was also bad so that he had been using a cane for a little over a year as the problem became progressively worse.  TR 74. Plaintiff reported that, as a result of the back, leg and knee problems, he was able to stand and walk for about fifteen minutes until his leg started tingling and that sometimes his left foot would sweat profusely while his right one did not, that he would get swelling in the lower part of his back so that it would feel as if he were sitting on baseballs and that the muscles would tighten and cause his leg to go numb.  TR 74-75.  Plaintiff also testified that he had muscle spasms and had difficulty sitting which limited his ability to sit to a maximum of 15 to 20 minutes if he relieved any pressure on his back by leaning forward.  TR 75-76.  Plaintiff also reported that lifting 15 pounds would cause him to experience severe back pain, and that he could only lift ten pounds without experiencing an increase in back pain.  TR 76.

18

Plaintiff reported that he was living in a medium to large travel trailer in a campground in Smyrna, Tennessee. TR 77. Plaintiff stated that he spent about a third of the day in a recliner with his legs elevated and that the rest of his time was spent getting up and walking for 10 to 15 minutes (at a time). TR 78. Plaintiff stated that he performed little to no housekeeping chores, that his wife, who was employed at Wal-Mart, attended to them; and that he did not need to perform chores on the lot where he was parked. TR 78-79.

Plaintiff reported that since he had moved to Tennessee, he had started seeing Dr. Tennenson, who was having some difficulties getting records from Dr. Knight and had not yet treated Plaintiff for his back problems. TR 79. Plaintiff also testified that he had not been hospitalized since his last operation in June of 1996, which was roughly the time at which he stopped his appliance repair business. TR 79-80. Plaintiff stated that his wife was working at Wal-Mart in 1996; that his tax return of that year reflected both their incomes; and that, in 1996, he had $3,486 in gross income from his business, of which he netted about $2,342 and that he had no income in 1997. TR 81.

Plaintiff restated that he had been injured at work in the mid 1980's, had undergone surgery in 1990, and that after five or six years of work out of his house as a self-employed appliance repairman, he reached the point where he could no longer perform that work because of his physical difficulties. TR 82-83. Plaintiff testified that his wife was the one who kept the books, that he had no employees in his business, and that he charged by the job, not the hour because it took him so long to complete a task. TR 84.

### 2. Vocational Testimony

Vocational expert ("VE"), Gina Thomas, also testified at Plaintiff's hearing. TR 86-89.

The VE characterized Plaintiff's appliance repair work as heavy and semi-skilled and his welding work as very heavy and semi-skilled. TR 87. The VE also explained that repair work was sometimes classified as medium, depending on how the shop was set up and what lifting was involved, but that the skill classification would remain the same. *Id.* The VE also stated that Plaintiff's ability to use tools, diagnose problems with appliances, small motors, timers, electrical controls and components would not transfer to other jobs in other industries at any level of exertion; in other words, Plaintiff did not have skills transferable to medium, light or sedentary work. *Id.*

The VE also stated that if the Plaintiff were limited, as Dr. Davis suggested, to lifting 50 pounds occasionally, 25 pounds frequently, standing and walking roughly four hours out of eight and was unable to squat, climb and work at heights, he would be able to perform a limited range of medium work. TR 87-88. The VE identified jobs available in the national economy which could accommodate those restrictions to be a hand packer, of which there were an estimated 1,500 at the medium level in Tennessee, and positions in laundry or dry cleaning places of which there were an estimated 500 in the state of Tennessee. TR 88. The VE also identified jobs in the filling type industries that would involve factory type work, of which there were approximately 1,000 jobs, but stated that the Plaintiff would not be able to perform those medium jobs because he did not have the ability to sit or stand long enough to accomplish that. TR 89. The VE further stated that, if the Plaintiff's testimony were "creditable," there would be no jobs in the national economy which he could perform. *Id.*

## C. Testimony from Plaintiff's September 14, 2000 Hearing

### 1. Plaintiff's Testimony

At his second hearing, Plaintiff testified he had an eleventh grade education, that he never got his GED, and that he had not worked since 1996. TR 31. Plaintiff confirmed that his birthday was September 6, 1940.[6] Id. Plaintiff confirmed that he had essentially worked two jobs in the period from 1981 to 1996 as an appliance technician and appliance repairman, which he said were essentially the same thing. TR 33-34. Plaintiff stated that the types of appliances on which he worked included refrigerators, washers, dryers, ranges and microwaves, and that in order to work on them he had to move them. TR 34. In cases where the appliances had to fit into a tight space, Plaintiff reported he had to move them with a two wheel hand truck and had to lift them himself. Id. Plaintiff reported that a refrigerator could top 200 pounds and that he would have to try to balance it and if he lost his balance, it would throw him down. TR 34-35. Plaintiff stated that the job required him to be on his feet most of the day. TR 35. Plaintiff also reported that his job as a welder was much more physically demanding because he had to handle very heavy I-beams, building structures, sand handling elevators and tanks. Id. Plaintiff reported that he had to lift up to 50 pounds frequently, meaning from one third to two thirds of the day, and up to 100 pounds or more, depending on the type of project on which he was working. Id. In addition, Plaintiff reported that he sometimes had to get in awkward positions, such as "standing on [his] head," and hanging on the side of a beam when working as both a welder and an appliance repairman. TR 35-36.

---

[6] At this point in the testimony, Plaintiff's attorney interjected and informed the ALJ that Plaintiff had qualified for SSI benefits based on a medical determination, though could not collect them because some property he owned in Ohio constituted excessive resources. TR 33.

Plaintiff stated that, prior to his back operation in 1990, he had been working for companies or employers that would not take him back after the surgery. TR 36. The company for which he had been working told Plaintiff that the doctor had restricted him to light duty and that they did not have work of that nature. *Id.* Plaintiff also testified that he had significantly reduced earnings for periods from 1990 to 1992 and then from 1993 to 1996. TR 36-37. Plaintiff indicated that at that time, he was self-employed and had been trying to work on a full time basis, but he could not manage it physically. TR 37. For instance, Plaintiff stated that he would sometimes have to take a day off because his back would swell and he just could not do the lifting. *Id.* Plaintiff stated that, having been in private employment for years, he would not have been able to work for an employer with those types of breaks. *Id.*

Plaintiff testified that he quit working because of the pain in his back, which he indicated hit where his belt fell. TR 37. Plaintiff stated that his back would swell up so that it felt as if he were sitting on it, like a basketball, and that when this happened, it would send a pain down his left leg which shot down to his foot and put it to sleep and made walking difficult. TR 37-38. Plaintiff reported that his back would swell when he lifted or carried about 20 pounds for approximately 15 to 20 minutes or walked across concrete floor which caused jarring in his back. TR 38. When his back began to swell, Plaintiff reported that he would sit down, stretch his leg a little bit, generally take some pain medication and rest for the remainder of the day, sitting in a relaxed chair, like a recliner, with his legs elevated to waist height and using a heat massager to get the swelling to subside. TR 38-39. Plaintiff reported that when his back starting hurting he might have to stay in this position all day as the pain usually stayed some time. TR 39-40.

Plaintiff stated that he had not worked anywhere since 1996. TR 40. Plaintiff also

testified that he was using a cane and had been doing so for about three and a half to four years, since shortly after he quit working, because when his left leg was numb he could not feel it and risked tripping or twisting his ankle. *Id.* Plaintiff also stated that he had pain and swelling in his right knee which had not subsided despite surgery about four years ago. TR 40-41. Plaintiff testified that, at the time he stopped working, he could only sit for about 15 minutes and that lifting a mere gallon of milk would cause shooting pain. TR 42. Plaintiff stated that he stopped doing any repair work in 1996. TR 43. With regard to his doctors, Plaintiff reported that he was treated by Dr. Kim Knight since before that time period, Dr. Collis (to whom he was referred by Dr. Knight), as well as Dr. Mark T. Finnerman, to whom he was referred for an evaluation. TR 44-45.

### 2. Vocational Testimony

Vocational expert ("VE"), Lisa Courtney, also testified at Plaintiff's hearing. TR 46. The VE stated that Plaintiff's past work had an SVP of four, and that it was semi-skilled and heavy. *Id.* The VE also stated that, in the national economy, welding and appliance repair was sometimes classified as medium if the work was done on smaller appliances. TR 46-47. The VE stated that there were transferable skills in the below medium category. TR 47. The VE also testified that there were a few jobs in the home repair lot, though the vast majority were in the medium and heavy categories. *Id.* However, in the VE's opinion, certain jobs were available for repairing small appliances like radios or mixers, which she believed required the same skill level as working on larger ones. *Id.* The VE testified that about 1,300 such jobs would be available at the light level in Tennessee and roughly 13,000 nationally. TR 48.

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and

23

asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 48. The ALJ described this hypothetical claimant as someone who could occasionally lift less than 50 pounds, frequently lift less than 25 pounds, stand and walk for less than six hours in an eight hour day, sit for eight hours, and had limited squatting and climbing and could not work at heights. TR 48-49. The VE answered that the hypothetical claimant would be capable of less than a full range of medium work and probably less than a full range of light work because of the limitation on standing for more than six hours. TR 49. The VE further stated that the hypothetical claimant would not be able to perform work at either the medium or light levels of activity and that these skills would not transfer to any other job. *Id.* The VE also stated that a limitation on bending and twisting would affect the capacity to perform light or medium work in this field. TR 50. When the VE considered all factors of the hypothetical as a whole, she stated that there would be a few jobs available at the medium level such as buffing and grinding and that there would be approximately 1,000 such jobs in the state of Tennessee. TR 51. The VE elaborated on these jobs, explaining that buffing and grinding required sitting but also some lifting that exceeded 20 pounds, that there might be roughly 1,000 jobs in semi-automatic machine operation which required lifting more than 20 pounds, and that and about 700 to 800 inspection jobs that also required lifting. *Id.*

The ALJ gave a hypothetical from another perspective, where exertion led to pain and discomfort that was moderately severe, was defined as pain which would have a significant effect upon a person's ability to sustain work activity and to concentrate and attend work, and which was not completely managed by exertional restrictions. TR 51. The VE indicated that the vocational implications of this type of pain would exclude all jobs. TR 52. The VE also testified

24

that if the person was limited to lifting no more than 20 pounds, standing and walking two hours a day, and sitting six hours a day, the person would only be capable of a restricted range of light work and would be unable to do any medium work. *Id.*

When questioned by the attorney, the VE confirmed that an individual limited to the extent described by Dr. Davis could not perform any work in Plaintiff's field and that Plaintiff had no transferable work skills given the residual functional capacity assessed by Dr. Davis. TR 52. The VE further testified that, if Plaintiff's testimony was found to be credible and consistent with the medical evidence, she could not identify any jobs he could perform at any exertional level on a sustained basis. TR 52-53. The VE also acknowledged that the field for home repair of small electronics was probably not as big as it once was because the price of electronics has dropped and it was no longer economically justifiable to pay a repairman $60.00 to fix a $9.99 radio. TR 53.

### III.  CONCLUSIONS OF LAW

### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been

25

further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's

26

age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[7] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175,

---

[7]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

27

1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that: (1) the ALJ failed to consider skill level in determining whether Plaintiff could do other jobs; (2) the ALJ failed to correctly apply SSR Ruling 83-12 to Plaintiff's claim; and (3) the ALJ made a finding that was inconsistent with the Vocational Expert's testimony. Docket Entry No. 12. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed. *Id.*

Sentence four of § 405(g) states as follows:

28

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. Consideration of Plaintiff's Skill Level

Plaintiff essentially argues that the ALJ did not ask the VE what skill was required to perform the jobs she indicated Plaintiff would be able to perform and that, without this information, it was inappropriate for the ALJ to apply Rule 203.12 of the Medical-Vocational Guidelines. Docket Entry No. 12. Furthermore, Plaintiff argues that the ALJ erred by not performing the analysis required by Social Security Ruling 83-12. *Id.*

The ALJ determined that, in accordance with Rule 203.12 of the Medical-Vocational Guidelines and VE testimony, Plaintiff had the residual functional capacity to perform jobs in the national economy at the medium exertional level. TR 21-22; 20 C.F.R. 404, Subpart P, Appendix 2. This grid rule is applicable because Plaintiff is of advanced age, has a limited education, engaged in past relevant work that was semi-skilled, and had skills that did not transfer to other work identified by the VE. TR 21; 29; 46-48.

29

When the VE identified jobs in the national economy at the medium exertional level that Plaintiff could perform, it was well established that Plaintiff's skills were non-transferable and that any work he would be able to do would thus have to be unskilled. TR 49-51. In the first hearing, ALJ Garner asked VE Gina Thomas, "So [Plaintiff] doesn't have transferable skills to medium, light or sedentary. Is that correct?" The VE responded, "That's correct." TR 87. In the second hearing, ALJ Haynes specifically asked VE Lisa Courtney: "there aren't any other jobs to which these skills transfer [?]," to which the VE responded, "no." TR 49. Once this was established, and in the context of a hypothetical which also assumed Plaintiff's skills did not transfer, the VE named jobs in the medium exertional category which the Plaintiff could perform: buffing, grinding and inspection jobs. TR 49-51. These jobs were therefore unskilled jobs, and the ALJ therefore properly took Plaintiff's skill level into account when concluding that he could perform the given medium jobs in the national economy.

## 2. SSR 83-12

In arguing that the ALJ erred by not applying SSR 83-12, Plaintiff essentially states that Plaintiff should have been classified as being capable of performing light work, not medium work, because the VE testified that Plaintiff's ability to perform medium work was significantly limited. Docket Entry No. 12.

SSR 83-12 deals with situations in which the occupational base is eroded because an individual's exertional RFC does not coincide with the definition of any one of the ranges of work as defined in the grid rules. SSR 83-12. In this case, Plaintiff argues that the occupational base at the medium level was eroded based on the VE's testimony and therefore, Plaintiff may have been improperly placed in the "medium" category for purposes of the grid analysis. Docket

Entry No. 12.

In situations where the degree of occupational base erosion is unclear, SSR 83-12 calls for a vocational specialist to provide guidance, and states that a VE may testify for this purpose at the hearing and appeals levels.  SSR 83-12.  In this case, the VE testified that Plaintiff was "very, very limited on the medium" (TR 50), but also identified a significant number of jobs at the medium exertional level which Plaintiff could perform.  TR 51.  This testimony, and the ALJ's subsequent holding, indicates that Plaintiff was deemed capable of performing work at the medium exertional level, and thus was properly classified as such for purposes of grid rule application.

### 3.  Significant Number of Jobs

Plaintiff essentially argues that the ALJ incorrectly said the Plaintiff was capable of work in the medium exertional category merely because there were several medium jobs he could perform, and that Plaintiff should in fact be placed in the light exertional category because the work he could perform in the medium category is actually severely limited.  *Id.*  Plaintiff argues that this finding is inconsistent with the VE's testimony.  *Id.*

The ALJ acknowledged that Plaintiff had limitations when working in the medium exertional category, clearly stating "this claimant cannot perform a full range of medium work." TR 21.  Step five of the sequential process of evaluation set forth in 20 C.F.R. §§ 404.1520, 416.920 requires that the ALJ find that the Plaintiff retains the residual functional capacity to perform a number of jobs identified by the VE which exist in "significant numbers" in the national economy.  The Sixth Circuit Court of Appeals has established that 1,350 jobs in the local economy constitutes a "significant number".  *Hall v. Bowen*, 837 F.2d 272, 274-275 (6th

Case 3:02-cv-00469   Document 18   Filed 04/13/06   Page 31 of 33 PageID #: 34

Cir. 1988).

The VE indicated there were approximately 800 buffing and grinding jobs, 800 inspection jobs, and 1,000 machine operator jobs, all available in the state of Tennessee. TR 51. The VE therefore identified a total of 2,600 jobs in the local economy at the medium exertional level that Plaintiff could perform. Plaintiff further contends that these jobs are neither "representative "nor "inclusive ," *i.e.*, that they do not constitute a sample of the types of medium jobs available. Docket Entry No. 12. However, the question is simply whether there are a significant number of jobs which Plaintiff could perform; whether these jobs are "representative" of other jobs in the same exertional category (in this instance the medium category) is not at issue.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED and Defendant's Motion for Judgment on the Administrative Record be GRANTED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

Case 3:02-cv-00469   Document 18   Filed 04/13/06   Page 32 of 33 PageID #: 35

_____

E. CLIFTON KNOWLES
United States Magistrate Judge

33